WAYMOND M. BROWN, Judge | Appellant appeals from the circuit court’s termination of his parental rights to G.B.[1] On appeal he argues that (1) there was insufficient evidence to support the grounds upon which his rights were terminated, and (2) there was insufficient' evidence to support the court’s potential-harm finding as part of its finding that termination of appellant’s parental rights was in G.B.’s best interest. We affirm. G.B. was removed pursuant to a 72-hour hold on October 10, 2012, pursuant to an ex-parte order of the same date, after his mother was arrested on multiple charges after becoming violent with a family member at G.B.’s birthday party in the presence of G.B. and a younger sibling. Appellant was incarcerated, as a habitual offender, throughout the [¡.pendency of the case.[2] On December 20, 2013, the circuit court entered an order terminating appellant’s parental rights to G.B. This timely appeal followed. I. Standard of Review In cases involving the termination of parental rights, there is a heavy burden placed on the party seeking to terminate the relationship.[3] This is because termination of parental rights is an extreme remedy in derogation of the natural rights of the parents.[4] Nevertheless, parental rights will not be enforced to the detriment or destruction of the health and well-being of the child.[5] Thus, parental rights must give way to the best interest of the child when the natural parents seriously fail to provide reasonable care for their minor children.[6] We review termination of parental rights cases de novo.[7] At least one statutory ground must exist, in addition to a finding that it is in the child’s best interest to terminate ^parental rights; these must.be proved by clear and convincing evidence.[8] Clear and convincing-evidence is that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established.[9] The appellate inquiry is whether the trial court’s finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[10] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[11] We do give a high degree of deference to the trial court, as it is in a far superior position to observe the parties before it and to judge the credibility of the witnesses.[12] II. Ground — Failure to Remedy Cause for Removal Arkansas Code Annotated section 9-27-341 states that parental rights may be terminated on the ground [t]hat a juvenile has been adjudicated by the court to be dependent-neglected and has continued to be out of the custody of the parent for twelve (12) months and, despite a meaningful effort by the department to rehabilitate the parent and correct Rthe conditions that caused removal, those conditions have not been remedied by the parent.[13] This particular ground requires that (1) the child be adjudicated dependent-neglected, (2) the child is out of the custody of the parent for twelve months, and (3) the parent failed to remedy the conditions that caused the child’s removal.[14] Appellant argues that this ground cannot be used against him because he was not responsible for the conditions that caused removal. DHS chose not to address this argument, focusing on the second argument only. We find merit in appellant’s argument. Though G.B. was adjudicated dependent-neglected, he was out of his mother’s custody for twelve months, not appellant’s. Furthermore, appellant did not cause G.B.’s removal, nor was his absence cause G.B.’s removal. This provision is not applicable to him and cannot support termination of his parental rights.[15] The circuit court clearly erred. III. Ground — Subsequent Factors Arkansas Code Annotated section 9-27-341 states that parental rights may be terminated on the ground [tjhat other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile’s health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate |5the parent’s circumstances that prevent the placement of the juvenile in the custody of the parent.[16] Accordingly, DHS was required to prove that (1) other factors arose subsequent to filing the original dependency-neglect petition, (2) the parent was offered appropriate family services, and (3) the parent manifested incapacity or indifference to remedying the subsequent issues. A. • Other Factors Subsequent • Appellant argues that this ground is not sufficient to support termination of his parental rights because his incarceration, as cited by DHS in its petition for termination, was not a subsequent factor where he was already imprisoned when the case began. DHS argues that appellant’s failure to comply with the case plan, due to his own incarceration, is a factor that occurred subsequent to the initial petition. In passing, DHS argues that appellant’s continued incarceration should be seen as a subsequent factor. Because we agree with DHS’s first argument, we do not address its second argument. Appellant was ordered to obtain individual counseling; not use illegal drugs or alcohol; obtain and maintain stable housing and employment that will be adequate for himself and G.B.; maintain a clean, safe home for himself and G.B.; complete twelve hours of parenting classes; demonstrate the ability to protect G.B. and keep him safe from harm; and follow the case plan and court orders. In its permanency-planning order, the court noted that appellant had “participated in parenting classes, life skills, sobriety classes, etc., in prison” but went on to note that he |r,could not care for the child because he would remain incarcerated for another nine months.[17] The court’s notation stated that appellant “participated in” the listed activities. Appellant provided no proof of participation in, or completion of, any of the programs.[18] There was no information detailing when these services were obtained, when or if they were completed, and more importantly, there was no indication at the termination hearing of whether those services made appellant a viable placement option for G.B., or made it so he would become a viable placement option within a reasonable amount of time after his release from prison, nine months after the hearing date. Additionally, he was never able to comply with the court’s other orders as the fact of the matter was that appellant was not employed and did not have a home, as he was incarcerated, and had no “concrete plan,” as argued by DHS, for a stable home at the time of his pending, but unspecified date of release.[19] The goal of section 9-27-341 is to provide permanency in a child’s life in circumstances in which returning the child to the family home is contrary to the child’s health, safety, or welfare and the evidence demonstrates that a return to the home cannot 17be accomplished in a reasonable period of time as viewed from the child’s perspective.[20] A child’s need for permanency and stability may override a parent’s request for more time to improve the parent’s circumstances.[21] Appellant argues that he should have been allowed more time to reunify with G.B. in light of the “significant and measureable progress he made.” We see none. Because appellant was incarcerated, he was unable to complete the case plan. However, we note that the analysis for an incarcerated parent differs from the analysis of a non-incarcerated parent. In Friend v. Arkansas Department of Human Services, this court discussed the balance of the rights of the incarcerated parent against those of the child in care: Although imprisonment imposes an unusual impediment to a normal parental relationship, it is not conclusive on the issue of termination. Nevertheless, a parent’s imprisonment does not toll his responsibilities toward his child. Tolling a parent’s obligations to comply with reunification orders while he is in jail would be contrary to the goal of the juvenile code to provide permanency for the child. The appropriate inquiry where a parent has been ordered to comply with a court’s reunification orders and is incarcerated is whether the parent utilized those resources available to maintain a close relationship with the child.[22] In this vein of analysis, the facts are that while appellant sent cards, letters, and at some prior period of time, money to G.B., appellant had not lived with G.B. more than six months of his life; had not physically seen G.B. since appellant was imprisoned in 2007 when G.B., who is now nine years old, was three years old; and G.B.,. while “fascinated” Rwith the idea of a father, did not recognize appellant as his father. There simply was no relationship between appellant and G.B. This is supported by the fact that appellant testified to wanting “a chance” to see his son when he got out; to “just really wanna [sic] talk to [G.B.] and be a part of [G.B.’s] life”; and “to be able to work with the custodians ... to have a relationship with [his] son.” Appellant never requested below, and does not now request, the ability to obtain custody of G.B. As stated by the court at the termination hearing, “little G.B. doesn’t know [appellant].” No potential services provided by DHS would have changed the fact that appellant’s relationship with G.B. was not close. B. Offered Appropriate Family Services Appellant argues on appeal that DHS failed to offer him appropriate services. He did not make this argument below. Where the court made numerous findings that DHS had made reasonable efforts and appellant, failed to appeal any of those findings below, appellant has waived this issue for purposes of appeal.[23] Appellate courts will not consider arguments raised for the first time on appeal.[24] Even if the argument were preserved, it would still fail. Appellant fails to cite any specific services that DHS should have or even could have provided for him while he was |Bincarcerated.[25] At the termination hearing, he did not request that he be given more services; he only requested that the circuit court give him more time to get out of prison. C. Manifest Incapacity or Indifference Appellant argues that DHS failed to prove that he had manifested the incapacity or indifference to remedy the subsequently-arising issues. We disagree. Appellant had remained incarcerated before and throughout the pendency of this case. Accordingly, he was incapable of completing the case plan and incapable of building a relationship with G.B., as discussed above. As stated before, appellant is seeking more time to build a relationship with G.B.; he never requested custody. Appellant’s need for more time is not a sufficient basis for reversal because the intent of the termination statute is to provide a child permanency when a return to the family home cannot be accomplished in a reasonable period of time as viewed from the juvenile’s perspective.[26] Even if appellant were to be released, it would require an extension of an unspecified amount of time for him to prove that he was capable of completing the case plan and building a relationship with G.B., the completion of which still would not necessitate that custody of G.B. be given to him.[27] | Accordingly, where appellant failed to comply with the case plan, had no relationship with G.B., had no proof that the services he had received made him a suitable and capable parent, and would not be released from prison for at least another nine months,[28] we hold that the circuit court did not clearly err in finding that DHS proved this ground. IV. Alternative Alternatively, even if this court had held that the circuit court clearly erred in finding that this ground supported termination of appellant’s rights, we would still affirm. In our de novo review, we may hold that other grounds for termination were proved, even when not stated in the circuit court’s order.[29] In its petition to terminate parental rights, DHS pled as a ground for termination that the parent is sentenced in a criminal proceeding for a period of time that would constitute a substantial period of the juvenile’s life.[30] Our review of the evidence convinces this court that this ground also supported termination of the appellant’s parental rights, though not stated in the circuit court’s order. |nThe court found in its September 25, 2013 permanency-planning order that appellant would be incarcerated for the next nine months.[31] Appellant had no contact •with G.B. for six years prior to being incarcerated up to and including the fourteen months that G.B. had been out of his mother’s care. Nine additional months is a substantial portion of G.B.’s life, especially in consideration of the fact that G.B. would remain in limbo, in terms of permanency, for an additional number of unascertained months while appellant attempted to prove his capability of being a parent. V. Best Interests Appellant challenges the circuit court’s finding that potential harm would come to G.B. if returned to appellant once appellant is released from prison. To terminate parental rights, a circuit court must find, by clear and convincing evidence, that doing so is in the best interest of the juvenile, while considering (1) the likelihood that the juvenile will be adopted if the termination petition is granted and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent.[32] There is no requirement that every factor considered be established by clear and convincing evidence; instead, after considering all factors, the evidence must be clear and convincing that termination is in the child’s best interest.[33] 112Appellant concedes that G.B. is adoptable in his brief to this court. However, he argues that “the record is devoid of the potential harm to G.B.” if returned to appellant when appellant is released from jail. In considering the potential harm caused by returning the child to a parent, the court is not required to find that actual harm would result or to affirmatively identify a potential harm.[34] Potential harm must be viewed in a forward-looking manner and in broad terms.[35] Additionally, the risk for potential harm is but a factor for the court to consider in its analysis.[36] Appellant’s argument relies heavily on supporting testimony from himself, his mother, and his wife.[37] The credibility of any witness’s testimony is to be assessed by the trier of fact — which may believe all, part, or none of it.[38] The fact remains that appellant would have needed at least nine more months to be released from prison and an additional unknown number of months to prove that he was ready to parent G.B. Furthermore, appellant’s failure to ask for custody of'GJB. evidences potential harm to G.B. As discussed earlier, appellant never asked for custody of G.B., only to have a | ^relationship with him. Accordingly, it could not be in G.B.’s best interest not to terminate appellant’s parental rights, where he was thriving with relatives who had already adopted two of his siblings and who wanted to adopt him as well, just so appellant could have a relationship with him. This is sufficient potential harm. Appellant relies on Cranford v. Arkansas Department of Human Services for the premise that allowing contact after termination of parental rights negates the need for termination of parental rights and diminishes any alleged threat of harm. This argument arose from GJB.’s guardians asserted openness to allowing appellant to have a relationship with G.B. once he had proved himself.[39] However, DHS spent a great deal of time distinguishing Cranford factually, specifically noting that before the Cranford children came into care, Cranford had had a stable home and employment, and had had a relationship with the children. Cranford was also sufficiently working the plan, had six weeks left on his sentence at the time of the termination hearing, expected to return to his former employment upon his release, expected to be able to care for the children within a month of his release, and there had been testimony that it would be in those children’s best interest to be in continued contact with Cranford. That case is very unlike the matter before this court in which appellant is a habitual offender who had no relationship with G.B. due to being incarcerated for six years of G.B.’s nine years of life. Furthermore, appellant had no stable home or employment due to his incarceration. Appellant was not fully working the plan due to his incarceration; was unsure of the date of his release; and did not know how long he would need to prove his parenting potential. There was no |14testimony from any credible person asserting that termination of appellant’s parental rights was not in G.B.’s best interest. A final distinguishing factor was that the persons caring for the children in Cran-ford — the grandparents — did not ask that the appellant’s rights be terminated, as they looked forward to the appellant stepping up when he was ready. That is totally opposite of this case in which G.B.’s caregivers — an aunt and uncle — have sought termination of appellant’s parental rights so that they can adopt G.B., which shows a total lack of faith in appellant’s ability. Everything about this case screams uncertainty. Continued uncertainty is itself potentially harmful to children.[40] Appellant’s reliance on Cranford is ill-placed. The circuit court did not err in finding that there was potential harm to G.B. Affirmed. Gladwin, C.J., and Vaught, J., agree. Hixson, J., concurs. Harrison and Whiteaker, JJ., dissent. . The parental rights of the child’s mother, Angela Poss, were also terminated via the same order; however, Poss is not a party to this appeal. . Appellant had been incarcerated since 2007. . Morrison v. Ark. Dep’t of Human Servs., 2013 Ark. App. 479, at 7, 429 S.W.3d 329, 334 (citing Blackerby v. Ark. Dep’t of Human Servs., 2009 Ark. App. 858, at 4, 373 S.W.3d 375, 378 (citing Camarillo-Cox v. Ark. Dep’t of Human Servs., 360 Ark. 340, 201 S.W.3d 391 (2005))). . Id. . Id. . Id. . Mitchell v. Ark. Dep’t of Human Servs., 2013 Ark. App. 715, at 1, 430 S.W.3d 851, 852 (citing Dinkins v. Ark. Dep’t of Human Servs., 344 Ark. 207, 40 S.W.3d 286 (2001)). . Id., 2013 Ark. App. 715 at 1, 430 S.W.3d at 853 (citing Ark. Code Ann. § 9-27-341 (Supp. 2011); M.T. v. Ark. Dep’t of Human Servs., 58 Ark. App. 302, 952 S.W.2d 177 (1997)). . Id., 2013 Ark. App. 715 at 2, 430 S.W.3d at 853 (citing Anderson v. Douglas, 310 Ark. 633, 839 S.W.2d 196 (1992)). . Id. (citing J.T. v. Ark. Dep’t of Human Servs., 329 Ark. 243, 947 S.W.2d 761 (1997)). . Id. (citing Yarborough v. Ark. Dep’t of Human Servs., 96 Ark. App. 247, 240 S.W.3d 626 (2006)). . Henson v. Ark. Dep’t of Human Servs., 2014 Ark. App. 225, at 7, 434 S.W.3d 371, 375 (citing Dinkins v. Ark. Dep’t of Human Servs., 344 Ark. 207, 40 S.W.3d 286 (2001)). . Ark. Code Ann. § 9-27-341(bX3)(B)(l)(a) (Supp. 2013). . Jackson v. Ark. Dep’t of Human Servs., 2013 Ark. App. 411, at 7, 429 S.W.3d 276, 280 (citing K.C. v. Ark. Dep’t of Human Servs., 2010 Ark. App. 353, 374 S.W.3d 884). . See id., 2013 Ark. App. 411 at 8, 429 S.W.3d at 281; Lewis v. Ark. Dep’t of Human Servs., 2012 Ark. App. 154, at 14, 391 S.W.3d 695, 704. . Ark. Code Ann. § 9-27-341 (b)(3)(B)(vii)(a ). . Furthermore, the court orally noted that appellant had not tested positive for drugs while he was imprisoned. However, because appellant remained incarcerated, he was never able to demonstrate whether he could remain drug free once released. . A DHS court report dated December 12, 2013, stated that appellant provided documentation of parenting class, "[hjowever, there is no indication of the number of completed hours, and the document is dated 3/12/09.” . Appellant testified that he would go to the home of his mother, his sister, or to a halfway home; but he was not certain. . Loveday v. Ark. Dep't of Human Servs., 2014 Ark. App. 282, at 9, 435 S.W.3d 504, 510 (citing Meriweather v. Ark. Dep’t of Health & Human Servs., 98 Ark. App. 328, 255 S.W.3d 505 (2007)). . Id. (citing Dozier v. Ark. Dep't of Human Servs., 2010 Ark. App. 17, 372 S.W.3d 849). . 2009 Ark. App. 606, at 12-13, 344 S.W.3d 670, 677. . Hamman v. Ark. Dep’t of Human Servs., 2014 Ark. App. 295, at 13, 435 S.W.3d 495, 503. . Burns v. Ark. Dep’t of Human Servs., 2013 Ark. App. 521, 429 S.W.3d 366. . See Friend v. Ark. Dep’t of Human Servs., 2009 Ark. App. 606, at 12, 344 S.W.3d 670, 676. . Reichard v. Ark. Dep’t of Human Servs., 2011 Ark. App. 762, at 12, 387 S.W.3d 279, 286 (citing Pine v. Ark. Dep’t of Human Servs., 2010 Ark. App. 781, 379 S.W.3d 703). . Even full completion of a case plan is not determinative of the outcome of a petition to terminate parental rights. Morrison v. Ark. Dep’t of Human Servs., 2013 Ark. App. 479, at 8-9, 429 S.W.3d 329, 335 (citing Cole v. Ark. Dep’t of Human Servs., 2012 Ark. App. 203, at 7-8, 394 S.W.3d 318, 322). . Appellant had been scheduled to be released on September 18, 2013, prior to the termination hearing, but his release date was pushed back through no fault of his own. . Ratliff v. Ark. Dep’t of Human Servs., 104 Ark. App. 355, 361, 292 S.W.3d 870, 875 (2009) (citing Smith v. Ark. Dep’t of Health and Human Servs., 100 Ark. App. 74, 264 S.W.3d 559 (2007); Johnson v. Ark. Dep’t of Human Servs., 78 Ark. App. 112, 82 S.W.3d 183 (2002)). . Ark. Code Ann. § 9-27-341(b)(3)(B)(viii)(a). . DHS stated in its petition that appellant testified to the same at the permanency-planning hearing. . Moses v. Ark. Dep't of Human Servs., 2014 Ark. App. 466, at 2-3, 441 S.W.3d 54, 55-56 (citing Hamman v. Ark. Dep’t of Human Servs., 2014 Ark. App. 295, 435 S.W.3d 495). . Id. . Jung v. Ark. Dep’t of Human Servs., 2014 Ark. App. 523, at 5, 443 S.W.3d 555, 558 (citing Welch v. Ark. Dep’t of Human Servs., 2010 Ark. App. 798, 378 S.W.3d 290). . Id. (citing Collins v. Ark. Dep’t of Human Servs., 2013 Ark. App. 90, 2013 WL 546940). . Id. (citing Carroll v. Ark. Dep’t of Human Servs., 85 Ark. App. 255, 148 S.W.3d 780 (2004)). . There was testimony that appellant’s mother had had little to no relationship with G.B. Furthermore, G.B.’s mother had caused G.B. to come into care and her parental rights had also been terminated. . Cosey v. State, 2014 Ark. App. 441, at 6-7, 439 S.W.3d 731 (citing Wheeler v. State, 2014 Ark. App. 281, 2014 WL 1856722). . 2011 Ark. App. 211, 378 S.W.3d 851. . Cranford, 2011 Ark. App. 211, at 10, 378 S.W.3d 851, 856 (citing Bearden v. Ark. Dep’t of Human Servs., 344 Ark. 317, 42 S.W.3d 397 (2001)).